JOHN F. DOYLE v. ANDREW J. RIES.[1]

August 23, 1940.

No. 32,352.

[1]Reported in 293 N. W. 614.

*Patrick J. Ryan,* for appellant.

*Oppenheimer, Dickson, Hodgson, Brown & Donnelly,* for respondent.

GALLAGHER, CHIEF JUSTICE.

John F. Doyle and Andrew J. Ries, Jr. were candidates for the office of abstract clerk of Ramsey county at the general election in November, 1938. Ries received the greater number of votes and was declared elected by the canvassing board. Doyle thereafter instituted this proceeding by petition to the district court to contest the right of Ries to hold the office upon the ground that the latter was not a citizen of the United States at the time of the election and therefore ineligible to hold office in this state. Ries answered, alleging that he was a native-born citizen of the United States, a resident and citizen of the county of Ramsey, state of Minnesota, and fully qualified to hold the office to which he was elected.

The case was tried upon a stipulation of facts which was supplemented by the testimony of Ries and that of a witness called in his behalf. The trial court found that at the time of the election Ries was a citizen of the United States and a resident of St. Paul, Minnesota; that he was duly qualified for the office of abstract clerk of Ramsey county; that he had been

duly declared elected to said office by the canvassing board of Ramsey county and a certificate of election issued to him by the county auditor of that county; and that he was duly and legally entitled to hold and retain the office. Doyle's petition was dismissed upon the merits and judgment entered accordingly. This appeal is from the judgment.

The following facts appear: Ries was born in St. Paul, Minnesota, on August 23, 1890. In July, 1906, his father moved to Canada and took his family, including Andrew, Jr., with him. About three years later Ries, Sr. became a naturalized citizen of Canada and a subject of Great Britain. On June 18, 1909, he acquired by patent from the Canadian government the land located in the vicinity of the village of St. Gregor in the province of Saskatchewan, upon which the family, including Andrew, Jr., resided.

On August 25, 1908, Ries, Jr. made application for a homestead entry upon a tract of land adjacent to that later patented to his father. On September 14, 1911, he made and filed an application for homestead patent which was duly allowed and a patent was issued to him on March 2, 1912. As part of the proof required by Canadian law in support of his application, Ries, Jr. submitted his father's certificate of naturalization, which was later returned to him. Embodied in the application for homestead patent and in support thereof was a sworn statement containing the following questions and answers:

(1) "Are you a British subject at the present time?" to which Ries answered: "Yes."

(2) "Have you always been one?" to which he answered "No"; and

(3) "Are you a British subject by birth, naturalization or repatriation?" to which he answered "By my father's naturalization."

Ries, Jr. retained the land thus acquired by patent until February 21, 1930, at which time he transferred it to his wife.

Some months later it was transferred by the wife to his mother.

Almost immediately after making application for a homestead patent in 1911, Ries returned to St. Paul, where he married and later became the father of two children. During his stay in St. Paul he voted at local, state, and national elections and assumed the ordinary duties of citizenship. In 1920, at his father's request, he returned to Canada and lived there with his wife and family until 1931. During that period he became the father of two more children. While in Canada he voted at local elections and held the office of secretary-treasurer of the village. It appears from the record that under the laws of Canada an alien may hold the office of village secretary-treasurer. He did not vote at any general election in Canada and did not take on oath of allegiance to the Dominion of Canada. In 1931 Ries again returned to St. Paul, where he has since resided. He has voted at general elections, held various public positions, and generally assumed the duties of citizenship.

■ The issue for determination is: Was Ries a citizen of the United States at the time of his election in November, 1938? From a recent decision of the United States Supreme Court, Perkins v. Elg, 307 U. S. 325, 329, 334, 59 S. Ct. 884, 887, 83 L. ed. 1320,[2] the legal principles necessary for a dis-

---

[2]In Perkins v. Elg, *supra*, plaintiff was born of naturalized parents in New York. While she was a minor her parents moved to Sweden and became naturalized. In pursuance of plans made before she reached the age of 21, she, on attaining her majority, returned to this country on an American passport. She was admitted as a citizen and resided here thereafter. About six years later she was notified by the department of labor that she was an alien and threatened with deportation. By action she sought a declaratory judgment that she was an American citizen, an injunction against the Secretary of Labor restraining the deportation proceedings and an injunction against the Secretary of State, who refused to issue a passport to her on the ground that she was not a citizen. It was held that plaintiff acquired citizenship by her birth; that this citizenship could not be lost save by statute, treaty or voluntary action; that her citizenship had not been lost. This case overruled the holdings in Ostby v. Salmon, 177 Minn. 289, 225 N. W. 158, and Koppe v. Pfefferle, 188 Minn. 619, 248 N. W. 41.

position of this case can be derived. Given judicial approval in that opinion were these rules of law: Absent treaty or statute to the contrary, a minor child who is a citizen of this country by our municipal law acquires, when taken by its parents to a country under the laws of which it is deemed a citizen, a dual nationality.[3] Its United States citizenship is not lost unless upon attaining majority the child either fails to elect to retain that citizenship and to return to the United States to assume its duties[4] or voluntarily renounces or abandons his United States nationality and allegiance.[5]

■ Born in the United States of American parents, Andrew J. Ries, Jr. thereby became an American citizen. When his father obtained a certificate of naturalization in Canada during his infancy, Ries, Jr. was by the law of that country (R. S. of Canada, 1906, c. 77, § 36) "deemed to be a naturalized British subject." No statute or treaty to the contrary appearing, he

---

[3]"As municipal law determines how citizenship may be acquired, it follows that persons may have a dual nationality. And the mere fact that the plaintiff may have acquired Swedish citizenship by virtue of the operation of Swedish law, on the resumption of that citizenship by her parents, does not compel the conclusion that she has lost her own citizenship acquired under our law. As at birth she became a citizen of the United States, that citizenship must be deemed to continue unless she has been deprived of it through the operation of a treaty or congressional enactment or by her voluntary action in conformity with applicable legal principles."

[4]"It has long been a recognized principle in this country that if a child born here is taken during minority to the country of his parents' origin, where his parents resume their former allegiance, he does not thereby lose his citizenship in the United States provided that on attaining majority he elects to retain that citizenship and to return to the United States to assume its duties."

[5]"Expatriation is the voluntary renunciation or abandonment of nationality and allegiance. It has no application to the removal from this country of a native citizen during minority. In such a case the voluntary action which is of the essence of the right of expatriation is lacking. That right is fittingly recognized where a child born here, who may be, or may become, subject to a dual nationality, elects on attaining majority citizenship in the country to which he has been removed."

then had a dual nationality—his United States citizenship was not lost. Thus we are brought to the questions: (a) Did Ries upon attaining his majority fail to elect to retain United States citizenship and to return to the United States and assume its duties, and (b) did he voluntarily renounce or abandon his United States nationality and allegiance?

(a) The answer to the first question must be in the negative. As reference to the statement of facts will disclose, Ries moved to the United States shortly after attaining his majority. Since that time he has assumed the obligations and taken advantage of the privileges of American citizenship.

(b) It is with respect to the second question that we have experienced difficulty. Ries, during minority, possessed a dual nationality which carried with it the right to select the one nationality that he preferred when he reached majority. Perkins v. Elg, 307 U. S. 325, 329. This right of election is exhausted by a single effective exercise. If Ries elected to acquire British nationality or renounced or abandoned his United States citizenship upon becoming of age, then his right of election was exercised. Thereafter he could not use this right of election to become a citizen of the United States. Necessarily this is so for the two available courses are mutually exclusive. Thus we are brought to the question whether Ries's conduct in acquiring the Canadian homestead constituted an election to become a British subject.

In answer to an inquiry contained in his application for a patent from the Canadian government, Ries stated that he was a subject of Great Britain. In response to the question by what method he had become a British subject, he answered, "By my father's naturalization." He made no other statements concerning his citizenship; neither did he take an oath of allegiance to Canada or Great Britain.

R. S. of Canada, 1906, c. 77, § 36, provides:

"If the father * * * has obtained a certificate of naturalization within Canada, every child of such father * * *

who, during infancy, has become resident with such father * * * within Canada, shall, within Canada, be deemed to be a naturalized British subject."

Ries's dual nationality afforded him the right to exercise the incidents and privileges of such dual citizenship. It was not until he passed legal infancy that he was required to make a selection. In determining whether he elected to become a subject of Great Britain to the exclusion of this nation, we cannot select isolated events or circumstances, but rather all of the relevant items of evidence must be considered. This is true in a citizenship case as much as in any other case involving the determination of whether an election has been made.

It would be futile to deny that Ries took advantage, initially while a minor, of one of the incidents that he possessed as a subject of Great Britain. But the mere enjoyment of such incident cannot and should not be taken as conclusive on the question of election. This is particularly true where the enjoyment commenced when the individual was a minor with a dual citizenship and then merely culminated shortly after reaching 21 years of age. It is equally material in deciding whether there was an election to consider the fact that Ries immediately after making the application did not stay in Canada but returned to the United States. Although he had exercised an incident of British nationality, his immediate return to the United States and his conduct thereafter strongly indicate that actually Ries's activities were directed toward the election of citizenship in the United States. After returning to this country he immediately undertook the duties and enjoyed the rights and privileges of a citizen of the United States to an extent far more consistent with an election of American citizenship than his activities in Canada indicated selection of British nationality. Relevant is the fact that this all occurred a short time after Ries reached his majority. He returned to Canada in 1920, but while he was there he did not perform any act that was inconsistent with his United States citizenship. This

factor is an additional element in favor of Ries's contentions. If Ries effectively elected to be a British subject when he became of age, it is immaterial what he thereafter did for he could not change his nationality except through the ordinary methods provided for naturalization of aliens. But it seems to us that the mere enjoyment of a single incident of British citizenship, especially in view of his subsequent conduct, is insufficient to require as a matter of law that we should hold Ries a British subject.

From the foregoing it should be evident that we do not think it is within the sphere of our powers or duties to disturb the findings of the trial court, for the evidence created a fact issue which properly could be resolved in favor of Ries. The findings are sustained by the evidence, and the trial court must be sustained.

Judgment affirmed.

JULIUS J. OLSON, JUSTICE (dissenting).

Finding myself unable to agree with the majority, it follows that my reasons for disagreement should be stated.

To me the facts establish, *as a matter of law*, that respondent, Ries, immediately upon attaining his majority irrevocably elected to become a citizen of Canada and that he voluntarily renounced and abandoned his nationality as an American citizen. He had arrived at full lawful age when the time came to perfect title to his homestead claim, a quarter section of land theretofore entered upon and operated pursuant to the laws of Canada, while still under age, yet his right thereto was subject to due compliance by him with all legal requirements to earn that title, one of which was that of becoming a citizen of that country. As a citizen of this country he could not "prove up" on this land. There was no chance for him to obtain title upon any theory of "dual nationality." His citizenship was only dual in the sense that upon arriving at majority he had a choice between the citizenship of his father's adoption and that of his own birth. He could not have both after committing himself

to either. In neither country was he required to take an oath of allegiance in order to make a choice. His status was to be determined by his actions. After majority, if he assumed or asserted rights under either citizenship, his action in so doing, in the very nature of things, amounted to a repudiation of the other. He could not then continue as a citizen of both countries. The rights and duties of one status were incompatible with the duties of the other. He voluntarily repudiated his American citizenship by declaring his British citizenship and thereunder asserting a right which as an American he could not have. By his own solemn declaration under oath he asserted that he was a British citizen by virtue of his father's naturalization, and upon that basis alone was this right founded. No one will claim, so it seems to me, that if he had made his own application to become a citizen there and this had been granted that there was not an election by him to become such. Yet where in principle is the distinction? Citizenship as a precedent requirement had to be met before title could be had. He selected his own status as he wanted it to be and as it had to be. His was the freedom of choice, and he should be required to accept the responsibility for such choice. There is no room for doubt or ambiguity concerning this act on his part. For nearly 20 years he held title to this property without disclosing to anyone any intention of repudiating his acquired citizenship there. He cannot claim ignorance of the law for it is not a question of what he believed it to be but what it was. If he had been called into military service there, even against the country of his birth, can there be any doubt of his liability to render such?

Perkins v. Elg, 307 U. S. 325, 329, 59 S. Ct. 884, 887, 83 L. ed. 1320, 1323, does not help him since the facts there recited and relied upon for decision are obviously out of line with those we have here. The point there determined, important as a precedent here, is thus stated by the court:

"It has long been a recognized principle in this country that if a child born here is taken during minority to the country of his parents' origin, where his parents resume their former allegiance, he does not thereby lose his citizenship in the United States *provided that on attaining majority he elects to retain that citizenship and to return to the United States to assume its duties.*" (Italics supplied.)

Instead of electing to "retain" his citizenship here he deliberately chose that of the country of his adoption. It is now too late to claim otherwise. Here we have a definite, undisputed fact wholly inconsistent with American citizenship from which only one inference can possibly be drawn. It puts too much strain on my judicial conscience to say there is a basis for drawing any other.

There should, I submit, be a reversal.

LORING, JUSTICE (dissenting).

I concur with the views expressed by MR. JUSTICE OLSON.