Antonino CAFIERO, Plaintiff,

v.

Robert F. KENNEDY, Attorney General of the United States, Defendant.

Civ. A. No. 338–62.

United States District Court
D. New Jersey.

Aug. 3, 1966.

Salvatore J. Vuocolo, Jersey City, N. J., for plaintiff.

David M. Satz, Jr., U. S. Atty., by Paul A. Nejelski, Asst. U. S. Atty., for the Government.

## OPINION

COOLAHAN, District Judge:

I. This is a declaratory judgment action brought pursuant to 28 U.S.C. § 2201, for a determination of plaintiff's citizenship.

On February 6, 1956 Antonino Cafiero entered the United States as a non-immigrant crewman and has remained here ever since. On June 14, 1957 deportation proceedings were instituted under Section 241(a) (1) of the Immigration and Nationality Act, 8 U.S.C. § 1251(a) (1). [Hereinafter "The Nationality Act].

As a bar to deportation, the plaintiff asserted American citizenship by virtue of his father having been a United States citizen at the time of plaintiff's birth. His American citizenship at birth was conceded, but the Special Inquiry Officer nonetheless found that Cafiero had expatriated himself by serving in the armed forces of Italy from May 5, 1953 through July 1, 1955 without the authorization of the United States Government. Section 349(a) (3) of the Nationality Act, 8 U.S.C. § 1481(a) (3).[1]

To establish expatriation under Section 349, the Government must prove the commission of an expatriating act listed therein by "clear, convincing and unequivocal evidence." Nishikawa v. Dulles, 356 U.S. 129, 133, 78 S.Ct. 612, 615, 2 L.Ed.2d 659 (1958). Cafiero's admission that he performed the aforesaid military service discharges that burden. Cafiero's defense was that his service had been involuntary since he was conscripted under the draft laws of Italy then in effect.

Loss of citizenship can only be a consequence of conduct which is voluntary. Mackenzie v. Hare, 239 U.S. 299, 311–312, 36 S.Ct. 106, 60 L.Ed. 297 (1915). Since Cafiero's averment of conscription injected the issue of voluntariness, Lehmann v. Acheson, 206 F.2d 592 (3rd Cir. 1953), the Government has the same heavy burden of establishing by "clear, convincing and unequivocal evidence" that the expatriating act was performed voluntarily. Nishikawa v. Dulles, supra; Perez v. Brownell, 356 U.S. 44, 78 S.Ct. 568, 2 L.Ed.2d 603 (1958).

At the hearing no determination was made as to whether his service in the Italian Navy was in fact "voluntary" in

1. Section 349 provides in part:
"(a) From and after the effective date of this chapter, a person who is a national of the United States whether by birth or naturalization, shall lose his nationality by—
 * * * * *
"(3) entering, or serving in, the armed forces of a foreign state unless, prior to such entry or service, such entry or service is specifically authorized in writ-

ing by the Secretary of State and the Secretary of Defense: *Provided,* That the entry into such service by a person prior to the attainment of his eighteenth birthday shall serve to expatriate such person only if there exists an option to secure a release from such service and such person fails to exercise such option at the attainment of his eighteenth birthday."

the sense required for constitutional expatriation. Rather, the Special Inquiry Officer expressly relied on the conclusive presumption of voluntariness prescribed in certain circumstances by Section 349(b) of the Nationality Act, 8 U.S.C. § 1481(b).[2] Indeed, the bulk of the hearing and the rehearing was concerned with adjudicating the facts necessary to trigger this presumption, i. e. Cafiero's dual nationality, and his ten year residence in Italy prior to military service.

■ The finding of deportability was affirmed by the Board of Immigration Appeals, and on September 16, 1960 Cafiero was ordered to leave the country or face deportation. Having exhausted his administrative remedies, Cafiero instituted this action in the District Court for the District of Columbia.[3] He seeks a judicial determination that he has not lost his American citizenship as a result of his service, and that the Government consequently lacks the fact of alienage necessary for deportation. He contends that the conclusive presumption of Section 349(b), as construed and applied to him, unconstitutionally predicates the very fact of voluntariness which is the *sina qua non* of valid expatriation, even though his service was actually involuntary.

Therefore, he seeks a judgment declaring: 1) that the finding of alienage based on that presumption is in violation of the Due Process clause of the Fifth Amendment to the United States Constitution; 2) that plaintiff is still an American citizen; and 3) that he is not subject to enforcement of the deportation order.

II. The constitutionality of expatriation under Section 349(a) itself was first upheld in regard to voting in foreign elections. Perez v. Brownell, supra.[4] A companion case, Nishikawa v. Dulles, supra, dealt with expatriation for service in foreign armed forces, but the majority never reached the constitutionality of the predecessor provision of § 349(a)(3).[5] The constitutionality of § 349(a)

2. "(b) Any person who commits or performs any act specified in subsection (a) of this section shall be conclusively presumed to have done so voluntarily and without having been subjected to duress of any kind, if such person at the time of the act was a national of the state in which the act was performed and had been physically present in such state for a period or periods totaling ten years or more immediately prior to such act."

In his opinion, the Special Inquiry Officer stated the following: "In order for this military service to operate to expatriate the respondent, it is necessary that it either have been voluntary in fact, or that it be by law conclusively presumed to have been voluntary. The Government relies upon the latter contention and the provisions of Section 349(b) of the Immigration and Nationality Act of 1952."

3. The District Court for the District of Columbia transferred the action to the United States Court of Appeals for the Third Circuit under the appellate review provisions of Section 106 of the Nationality Act, 8 U.S.C. § 1105. In turn, the Court of Appeals transferred the matter to this Court since there was a genuine issue as to plaintiff's nationality. Section 106(a) (5) (b) of the Nationality Act, 8

U.S.C. § 1105a. It is settled law that where a substantial claim of citizenship has been made, the claimant is entitled to a full judicial determination in a *de novo* proceeding of the facts bearing on his alienage or citizenship. Ng Fung Ho v. White, 259 U.S. 276, 42 S.Ct. 492, 66 L.Ed. 938 (1922); Perez v. Brownell, supra, 356 U.S. at 47, 78 S.Ct. 568.

4. In Perez, Mr. Justice Frankfurter concluded from a detailed review of the legislative history that the provision was intended to regulate the complications of foreign policy which arose from acts of American nationals abroad. The expatriation through voting provision was upheld because there was a sufficient rational nexus between this goal and the chosen means of expatriation. 356 U.S. at 60, 78 S.Ct. 568. The Court found Congress had broad discretion within this framework to implement its power over foreign affairs recognized in United States v. Curtiss-Wright Export Co., 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936).

5. In Nishikawa, the Court voided the plaintiff's expatriation on the ground that the Government had not adequately established that his service in the Japanese Imperial Army during the Second World War was voluntary. However, Mr. Jus-

(3) was affirmed later, in United States ex rel. Marks v. Esperdy, 203 F.Supp. 389–396 (S.D.N.Y.1962), affirmed on opinion below on question of constitutionality, and alienage, 315 F.2d 673, 675 (2nd Cir. 1963), affirmed 377 U.S. 214, 84 S.Ct. 1224, 12 L.Ed.2d 292 (1964) (equally divided court), rehearing denied, 377 U.S. 1010, 84 S.Ct. 1904, 12 L.Ed. 2d 1059 (1964).[6] The *Marks* case also distinguished Section 349(a) (3) from the provision expatriating wartime deserters which had been struck down as a cruel and unusual punishment prohibited by the Eighth Amendment in Trop v. Dulles, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958).

The constitutionality of the conclusive presumption of voluntariness in Section 349(b), has not yet been judicially determined. In the administrative hearing, the question was noted but not considered. The Special Inquiry Officer simply found the presumption operative in Cafiero's case and felt obliged to apply it without going any further into the facts of his service than that section required.[7]

 The Court's present duty is a different matter, Plaintiff here seeks not merely a decree that an administrative ruling of deportability is void. He seeks the Court's affirmative imprimatur on his claim to United States citizenship. Hence the necessary scope of inquiry is broader than the statutory limits which bound the administrative officers to apply § 349(b). In accordance with established doctrines of constitutional litigation, this Court must first decide if Cafiero's service in the Italian Navy was voluntary as a matter of fact (apart from the operation of § 349(b).) Only if the Government cannot establish the voluntariness of his service by "clear, convincing and unequivocal" evidence, need the conclusive presumption of § 349(b) be relied upon to validate his expatriation, and only then will it be necessary to reach the constitutionality of that presumption. Such considerations of the statute's constitutionality should be deferred if the resolutions of other issues may permit disposition of the litigation on non-constitutional grounds. Ashwander v. T. V. A., 297 U.S. 288, 345–348, 56 S.Ct. 466, 80 L.Ed. 688 (1936), Brandeis, J., dissenting.[8]

III. After issue was joined, summary judgment motions by both parties were

---

tice Harlan's dissent indicated he found the section clearly constitutional on the basis of Perez.

6. Judge Cashin soundly reasoned that such service presented an *a fortiori* case in comparison to voting; he found it "[O]bvious that service by a United States citizen in the armed forces of another nation, without the authorization of the American Government, carries with it even greater danger of embroiling the international relations of the United States than would mere voting in a foreign election. This court will not deny to Congress the reasonable belief that under the present hazardous international circumstances there is not acceptable alternative to expatriation as a means of avoiding possible embarrassment in and jeopardy to our relations with other nations." 203 F.Supp. at 395.

7. In his opinion of August 14, 1959, the Special Inquiry Officer acknowledged: "A substantial question as to the constitutionality of this provision [8 U.S.C. 1481 (b)] may exist. However, this administrative tribunal has no authority to pass on questions of constitutionality."

8. The case at bar illustrates a primary reason for such deferment. By deciding non-constitutional issues first and, where possible, disposing of entire actions before reaching the constitutional arena, the constitutional questions are thrown into much sharper focus and given concrete form when it becomes necessary to deal with them. Here, Cafiero's complaint is that having been drafted involuntarily he will nonetheless be conclusively presumed to have served voluntarily. Hypothetically posed, the argument remains an abstract possibility; the provision's validity could be more starkly tested if a court had before it someone already factually adjudged not to have acted voluntarily. Then the contrary-to-fact application of the presumption would be underlined in the face of the Supreme Court's admonition that expatriating acts must be voluntary.

Moreover, it should be noted that even if Cafiero were permitted to attack the constitutionality of Section 349(b) at the

denied and a trial was had without a jury. On the basis of that hearing, the briefs and exhibits, I find the facts and circumstances of plaintiff Cafiero's service in the Italian Navy to be as follows.

Plaintiff was born in Sorrento, Italy on May 15, 1932. At that time his father, who had been born in America, was an American citizen and the plaintiff, therefore, acquired both American and Italian nationality at birth. At the age of 18, he served as a commercial seaman for approximately a year on an Italian oil tanker which traveled European and Middle Eastern ports. As a result, he was not called with his draft class of 1932 but was "aggregated" or called to active duty a year later with the class of 1933.[9] He entered the Italian Navy on June 18, 1953 and following his discharge on July 1, 1955, came to this country for the first time, as a commercial seaman on the aforementioned date of entry.

■ It is the presumption raised by this process of conscription which the Government must overcome with proof of voluntariness. However, this heavy burden is not to be confused with a showing of intent to renounce citizenship or with knowledge that expatriation would occur. Neither need be demonstrated. Savorgnan v. United States, 338 U.S. 491, 70 S.Ct. 292, 94 L.Ed. 287 (1950); United States ex rel. Marks v. Esperdy, supra, 203 F.Supp. at 395.[10] It suffices if the plaintiff knew at the time of such act or acts that he was an American citizen. Rogers v. Patokoski, 271 F.2d 858 (9th Cir. 1959).

Cafiero's testimony in this regard is contradictory. He testified at the deportation hearing that he entered this country as an Italian crewman because he thought that his military service had terminated his American citizenship. He also testified at the hearing and at the trial that he knew his father was an American citizen and that he had told the inducting officers that he (plaintiff) was an American citizen. Yet at a later point in the trial he claimed that he first became aware of his American citizenship after talking to fellow crewmen en route to the United States.

On the basis of all the testimony and my appraisal of his credibility on this point, I am convinced that Cafiero knew he was an American citizen when he entered the Italian armed forces.

■ On the other hand, the overall determination of voluntariness cannot be based solely on an evaluation of petitioner's credibility. "Nor can the district judge's disbelief of the petitioner's story of his motives and fears fill [an] evidentiary gap in the Government's case." Nishikawa v. Dulles, supra, 356 U.S. at 137, 78 S.Ct. at 617. The critical inquiry then, is to determine the manner in which the Government may establish by affirmative evidence that Cafiero's service, albeit conscripted, was voluntary.

■ In contrast to an individual's enlistment on his own initiative, conscription admittedly connotes an externally imposed requirement. Yet if such service were deemed inherently involuntary, the provision of Section 349(a) (3) would be virtually emasculated in view of the fact that most modern nations

outset, he could only establish that the provision as applied to him was unconstitutional by first showing that in fact his service had been involuntary.

9. Under the conscription law then in effect, young men in Italy subject to draft are called into military service by "classes" composed of men who are all born in the same year. When the members reach 18 years of age, their names are posted in the town of their residence. They then register, take physical exams, and are either deferred or placed on an enroll-

ment list, to be called to active duty approximately two years later when they are about 20 years old.

10. Writing for the majority in Perez v. Brownell, supra, Mr. Justice Frankfurter said: "Of course, Congress can attach loss of citizenship only as a consequence of conduct engaged in voluntarily [citation omitted]. But it would be a mockery of this Court's decisions to suggest that a person, in order to lose his citizenship, must intend or desire to do so." 356 U.S. at 61, 78 S.Ct. at 577.

have some form of conscription, and many have universal military training. The point is that from the individual's perspective the draft may not be such an impelling motive that he is forced to serve despite a firm purpose to avoid it. Whether from a resigned sense of duty, or with genuine enthusiasm, "military service is frequently performed willingly, freely, even voluntarily, although technically there is no enlistment but conscription under a 'compulsory' service law." Acheson v. Maenza, 92 U.S.App. D.C. 85, 202 F.2d 453, 458 (1953). Hence the Supreme Court's recognition that the Government *might* meet its burden of proof even though the plaintiff was conscripted under a system providing penal sanctions for evasion. Id., 356 U.S. at 141, 78 S.Ct. at 619, Frankfurter, J., concurring.

In attempting to prove voluntariness in the sense outlined above, the Government cannot plumb Cafiero's past thoughts in the face of his testimony that he served unwillingly. It can only establish his state of mind inferentially by evidence of what steps he did or did not take in connection with his conscription. Ibid.

■ As jurists, the majority in Nishikawa doubtless were aware of this evidentiary problem; their direction should not be read as a demand that the Government attempt the impossible. Therefore, I am of the view that where the clear, convincing weight of evidence shows plaintiff made no real attempt to avoid the service in question, though several avenues were open which might at least have been explored, voluntariness may be sufficiently established within the judicial gloss upon Section 349(a) to discharge the Government's burden.

With this framework in mind, we turn to the circumstances surrounding plain-

tiff's induction. Under Italian law, Cafiero was entitled to petition a civil court to challenge his draft enrollment for *inter alia,* reasons of age or citizenship. Such a petition is a normal statutory procedure and Cafiero would not be subject to any penalty. If he could not retain counsel, the local Bar Association would have provided legal aid as a public service.

Cafiero made no such petition. Nor did he protest his conscription to the American Consulate at Naples which was only 20 miles away or attempt to obtain permission of the Secretary of Defense to serve without losing his American citizenship. There would have been no penalty for a dual national like Cafiero seeking such assistance. Moreover, his family apparently was well acquainted with the availability of this Consulate and had frequently gone there to explore problems of citizenship and travel.[11]

Furthermore, an Italian citizen is not subject to conscription as long as he remains abroad. Yet Cafiero never chose to come to America even when he knew or should have known that conscription was imminent.

■ Such failure to protest his conscription or to seek the assistance of the United States Consul is a pertinent factor in judging voluntariness. United States ex rel. Marks v. Esperdy, supra, 203 F.Supp. at 394. In Nishikawa v. Dulles, supra, the petitioner's failure to make such protests were held insufficient to establish voluntariness. However, Nishikawa had already been told by the American Consulate that such protests would be of no avail, and there was substantial reason to fear physical violence in reprisal. 356 U.S. at 137, 78 S.Ct. at 617. Indeed most of the recorded cases involving the question of expatriation

---

11. Cafiero's father had visited the Consulate at Naples "10 or 12 times." His sister visited the Consulate in Naples two or three times and eventually came to the United States as an American citizen. One brother visited the Consulate "4 or 5 times", and another brother "probably" visited this local United States Consulate. Thus, despite the fact that at least three and probably four members of his family had visited the Consulate [which was located only a few miles from his home] on numerous occasions to inquire concerning their American citizenship, plaintiff never once visited this Consulate or made such efforts.

for military service on behalf of a foreign sovereign concerned service in the totalitarian armies of Japan, Italy and Germany, directly preceding or during the Second World War. In such cases, where dual nationals had been faced with ugly threats of physical violence and compulsion, the courts' typical reaction was that "[T]he law does not exact a crown of martyrdom as a condition of retaining citizenship." Tomasicchio v. Acheson, 98 F.Supp. 166, 174. (D.D.C.1951). Cafiero's service, performed during peacetime in Italy when it was a military ally of the United States and a democratic partner in the North Atlantic Treaty Organization, is clearly a distinguishable situation which must be examined on its own facts.

 Each of these circumstances presents strong proof of plaintiff's willingness to serve in the Italian armed forces despite his American citizenship. Collectively, they are indicia which I find constitute "clear, convincing and unequivocal evidence" that the plaintiff failed to take advantage of the opportunities which existed to challenge and avoid that service, and which cannot be said to have been clearly futile. The Government, therefore, has met its burden of demonstrating that Cafiero's service was a voluntary act of expatriation within the meaning of Section 349(a) (3), 8 U.S.C. § 1481(a) (3).

 Nor is this result changed by the fact that Cafiero was a dual national, whose non-American nationality was that of the country in whose armed forces he served. In Nishikawa v. Dulles, supra the applicable statute was Section 401(c) of the 1940 Immigration and Nationality Act, the predecessor provision of Section 349(a) (3) of the 1952 Act. Section 401 (c) *limited the expatriating effect of service in the armed forces of another country to those who were dual nationals of that country and of America,* either before or by virtue of such service.[12]

Addressing this change, the Court in Nishikawa noted that

"The present provision, Immigration and Nationality Act of 1952, § 349(a) (3) * * * 8 U.S.C. § 1481(a) (3), eliminates the *necessity* that the expatriate have or acquire the nationality of the foreign state." 356 U.S. at 130, n. 1, 78 S.Ct. at 614. [Emphasis added].

The implication is unmistakable that while expatriation for such service is no longer limited to dual nationals in Cafiero's position, they are still subject to its operation. Compare Jalbuena v. Dulles, 254 F.2d 379 (3rd Cir. 1958); Dulles v. Katamoto, 256 F.2d 545 (9th Cir. 1958); Tanaka v. Immigration & Naturalization Service, 346 F.2d 438, 448 (2nd Cir. 1965) Judge Kaufman dissenting.[13]

---

12. "A person who is a national of the United States, whether by birth or naturalization, shall lose his nationality by:
 "(c) Entering, or serving in, the armed forces of a foreign state unless expressly authorized by the laws of the United States, if he has or acquires the nationality of such foreign state * * *."

13. *Jalbuena* and *Katamoto*, both decided shortly after the *Perez-Nishikawa-Trop* trilogy was handed down by the Supreme Court, interpreted them as requiring some rejection or flouting of the petitioner's American nationality. It is argued that a dual national's mere performance of his duties to the second sovereign of his citizenship could not be considered tantamount to such renunciation of his Ameri-

can nationality as to justify expatriation. 254 F.2d at 381; 256 F.2d at 548.
 More recently, however, the Supreme Court has shed further light on what *Perez,* et al. in fact require:
 "Views of the Justices have varied when it comes to the problem of expatriation. There is one view that the power of Congress to take away citizenship for activities of the citizen is nonexistent absent expatriation by the voluntary renunciation of nationality and allegiance. See Perez v. Brownell, 356 U.S. 44, 79, 78 S.Ct. 568, 586–587, 2 L.Ed.2d 603 (dissenting opinion by Justices Black and Douglas); Trop v. Dulles, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (Opinion by Chief Justice Warren). *That view has not yet commanded a majority of the entire Court.*" Schneider v. Rusk, 377

Since the Court finds that plaintiff Antonino Cafiero has lost his American citizenship under the provision of Section 349(a) (3) of the Nationality Act by reason of his voluntary service in the armed forces of Italy, his application for a declaratory judgment of citizenship and non-deportability must be denied. Moreover, since this finding is based on the voluntary character of that service as a matter of fact, the Court does not reach and expresses no opinion on the constitutionality of Section 349(b) of the Act, 8 U.S.C. § 1481(b).

Wherefore, in light of the foregoing and for all the reasons discussed therein, plaintiff's action for a declaratory judgment against the Attorney General of the United States of America is dismissed.

Let an appropriate order be submitted.

U.S. 163, 166, 84 S.Ct. 1187, 1189, 12 L. Ed.2d 218 (1964). [Emphasis added].

Even if the opinions in *Jalbuena* and *Katamoto* have survived this passage from Schneider v. Rusk, they deal with mere affirmations of the petitioner's foreign nationality through a formal declaration, not with the diminution in allegiance to America inherent in foreign armed service.